IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | | * | |
| | | * | |
| v. | | * | Crim. No. PX-22-00091 |
| | | * | |
| HARRIETT JACKSON, *et al.*, | | * | |
| | | * | |
| *Defendants* | | * | |
| | | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION TO SUPPRESS

Defendant Harriett Jackson ("Ms. Jackson"), through undersigned counsel and pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, files this Motion to Suppress seeking an Order barring the government from admitting at trial any and all direct and derivative evidence resulting from the search of ███ Sir Michael Place, Glenarden, Maryland 20706.

## INTRODUCTION

On March 31, 2022, U.S. Magistrate Judge Charles B. Day signed a federal search and seizure warrant (the "Warrant") authorizing law enforcement to search a property in Glenarden, Maryland (the "Glenarden Residence" or "Target Premises 2") for physical and electronic records alleged to contain evidence of conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. § 1343, and aggravated identify theft, in violation of 18 U.S.C. § 1028A (collectively, the "Target Offenses") committed by Ms. Jackson and two other individuals, Akbar Masood ("Masood") and Michelle Peebles ("Peebles"). *See* **Exhibit 1.** Accompanying the Warrant was an Affidavit in Support of an Application Under Rule 41 for Warrants to Search and Seize ("Affidavit") sworn out by Special Agent Joshua T. Kimrey ("SA Kimrey") of the United States Army Criminal Investigation Division ("CID"). *Id.* On April 6, 2022, the Warrant was executed at the Glenarden Residence, at which time the property items

described in the "Evidence/Property Custody Documents" attached as compendium Exhibit 2 were seized. For each of the independent reasons explained below, all direct and derivative evidence obtained in connection with the April 6 search and seizure should be suppressed.

First, the Affidavit failed to establish probable cause to permit the search of the Glenarden Residence because it lacked sufficient facts implicating Ms. Jackson in the Target Offenses. The Affidavit's probable cause relates to alleged false billing by HMA Solutions, LLC, but there is not a single fact supporting that Ms. Jackson was involved in the HMA billing. Second, the Affidavit rested on stale information, as the events it detailed all occurred at least between three and five years before the Warrant was issued. Third, the scope of the items to be seized was overbroad, essentially authorizing law enforcement to conduct a fishing expedition of records and devices which led to the impermissible seizure of evidence wholly unrelated to HMA's alleged commission of the Target Offenses. Finally, the April 6 search and seizure is not saved by the "good faith" exception to the exclusionary rule because the activity of law enforcement in this case was objectively unreasonable. For each of these reasons, this Motion should be granted and all evidence, direct and derivative, secured as a result of the Warrant should be suppressed.

**FACTUAL BACKGROUND**

On March 31, 2022, more than three years after the last alleged activity in furtherance of the Target Offenses, SA Kimrey swore out the Affidavit in support of the Warrant for the Glenarden Residence based on his training, experience, and belief that Ms. Jackson, Masood and Peebles[1] – through HMA – committed violations of the Target Offenses "in various United States Government contracts." Ex. 1, ¶ 7. SA Kimrey broadly represented that, based on his "training and experience, … knowledge of this investigation[,] and the longevity of the scheme[,]" there was

---

[1] Peebles and Masood are named Co-Defendants.

probable cause to believe that the Glenarden Residence contained "evidence, instrumentalities, and fruits of the Target Offenses[.]" *Id.* (emphasis removed).

## I.   "Probable Cause" Section[2]

The "Probable Cause" section of the Affidavit largely focuses on a fraudulent billing scheme allegedly devised and carried out by HMA in its performance under two professional services contracts between early 2017 and January 2019 – (1) Contract W91YTZ-14-DM111 ("M111 Contract") for coding and auditing services at Walter Reed National Military Medical Center ("WR") and (2) Contract HHSP233201750136A ("136A Contract") for coding and auditing services at the National Capital Region ("NCR").

### A.  M111 Contract

The M111 Contract was awarded to Infused Solutions LLC ("Infused") on December 17, 2013, for the purpose of reviewing, validating, and ensuring that "patients' encounters" medical codes were input accurately into WR's medical database. Infused was compensated under the M111 Contract based on the number of patient encounters it completed. The M111 Contract was renewed in December 2016. Beginning in February 2017 and continuing until January 2019, pursuant to two consulting agreements, HMA assisted Infused with the M111 Contract by providing medical coding and auditing support. During this time, HMA submitted invoices for coding services performed to Infused, which in turn submitted invoices to WR.

### B.  136A Contract

The 136A Contract was awarded to R.T. McCalpin & Associates, LLC ("RTM") on September 29, 2017, for coding and auditing work at NCR. According to the Affidavit, Masood

---

[2] This section is recited from the Affidavit and no statements in this section constitute a concession or admission on behalf of Ms. Jackson.

directed RTM to use HMA and another subcontractor – Case Healthcare Solutions, Inc. ("CASE")[3] – to perform the coding and auditing work under the 136A Contract. On October 4, 2017, Ms. Jackson, on behalf of CASE, sent RTM a signed Medical Coding and Auditing Services Agreement memorializing the subcontracting arrangement between RTM and CASE. On October 17, 2017, Masood, acting as "Renee Connor" on behalf of HMA, sent RTM a similar subcontracting agreement memorializing the work to be performed under the 136A Contract by HMA. Both HMA and CASE submitted invoices to RTM, though the Affidavit does not state when.

The Affidavit contains *no* allegations of any wrongdoing under the 136A Contract by CASE (or Ms. Jackson). In fact, SA Kimrey acknowledges that work was completed under the 136A Contract by employees of CASE or Infused. Rather, the Affidavit describes SA Kimrey's belief that Masood "fraudulently provided a subcontractor agreement … to [RTM] in order to create a subcontractor relationship between HMA and RTM in which RTM paid HMA $32,236.25 each month during the course of the contract." Ex. 1, ¶ 20. Because HMA was not actually performing any work under the 136A Contract (as all work was completed by CASE or Infused), "the amounts paid to HMA [were] pure profit[.]" *Id.*

### C. Investigation Into HMA

According to the Affidavit, CID's investigation in this matter was prompted by a report from an unnamed complainant at some unidentified time that HMA was created by Masood, Peebles, and Ms. Jackson "solely for the purpose of submitting fraudulent invoices" that represented that services were performed when, in fact, they were not.

---

[3] CASE is more fully discussed *infra* at Section I.D.

The Affidavit details SA Kimrey's review of HMA's formation documents, bank account records, email addresses, invoices, and various emails. HMA was established on December 30, 2016, by Masood and Peebles. The System for Award Management ("SAM.gov") identified Peebles as HMA's President and listed her home address ("Target Premises #1" identified in the Affidavit) as HMA's registered address. At some unspecified time, Masood tasked his assistant with creating email addresses for HMA and a website for HMA through the "GoDaddy" platform. In January 2017, Masood opened a bank account ("Account 4418") for HMA at TD Bank and listed only himself as HMA's authorized representative. A signature card for another TD Bank account ("Account 7442") listed Masood's email address and home address in Great Falls, Virginia.

The Affidavit details an alleged "fraudulent enterprise" through which, according to SA Kimrey, HMA caused approximately $1.7 million in fraudulent invoices to be paid by WR under the M111 Contract. SA Kimrey describes several affirmative actions taken by Masood and Peebles in furtherance of that alleged "fraudulent enterprise," but none by Ms. Jackson.

From January 2017 to December 2018, Masood, through an "accounting@hmasolutionsllc.com" email address, sent invoices to Kristine Gillespie ("Gillespie"), Infused's Human Resources Manager, totaling the number of outpatient, inpatient, and/or APV encounters HMA "employees" completed each month under the M111 Contract. According to SA Kimrey, however, "[i]t appears that HMA did not employ anyone who could have legitimately conducted coding of encounters for [WR] in compliance with the requirements of [C]ontract M111." Gillespie then would forward the HMA invoices to Peebles, as Infused's Site Manager, for approval, which Peebles promptly provided each month. As Infused's Site Manager, Peebles had access to the total amount of coding work performed for WR monthly, including by

its own government employees and Infused's hourly employees, which she used to claim that all medical coding work under the M111 Contract was performed by Infused (and therefore enabled HMA to claim it was responsible for coded encounters that were performed by others). The Affidavit further identifies a series of emails between Peebles and Masood that "demonstrate [their] attempts to ensure all the HMA contract line items were billed to [WR] via Infused" and to "provide a false impression that HMA was a company separate from Peebles' and Masood's interests." These actions (among others), SA Kimrey represents, were conflicts of interest for both Masood and Peebles.

### D. CASE

The Affidavit also states that at some time "previously" (no timeframe is identified), Masood, Peebles, and Ms. Jackson created CASE, with a registered address of 12110 Sunset Hills Road, Suite 600, Reston, VA 20190, which the Affidavit erroneously identifies as "TARGET PREMESIS [sic] #2.[4]" The Affidavit gratuitously references a contract awarded to CASE on September 30, 2019 for medical coding audit support for military treatment facilities at NCR ("2019 CASE Contract"), yet provides *no* facts or other statements related to this 2019 CASE Contract whatsoever, let alone any to suggest alleged wrongdoing. As discussed below, inclusion of this singular reference to the 2019 CASE Contract can only be viewed as a conspicuous attempt to cure the staleness of the Warrant by giving the impression that relevant conduct occurred sometime in the recent past.[5] Lastly, *far* from constituting probable cause, the Affidavit goes on to make the sweeping accusation that "[i]nformation obtained during the course of the

---

[4] "Target Premises #2" of course is the Glenarden Residence.
[5] Not only was the attempt unsuccessful because there are no facts suggesting any wrongdoing under the 2019 CASE Contract, but any facts relating to the three-year old contract would have been too stale to support probable cause for the requested warrant in March 2022.

investigation *suggests* that Masood, Peebles, and Jackson committed the Target Offenses through other government contracts supported by CASE, using another method of disguising their participation." Affidavit, ¶ 14 (emphasis added). Notably, however, there is *nothing* in the Affidavit to support this far-reaching conclusion.

II.     **"Cause to Believe Evidence is Located in the Target Locations" Section**

Agent Kimrey concludes that "there appears to be no physical office location for HMA," and therefore Masood, Peebles, and Ms. Jackson would have needed "to use electronic devices in their possession to create fraudulent documents and emails and send emails and invoices to perpetuate the fraud." There is no discussion of CASE's physical office.

With respect to the Glenarden Residence specifically, the Affidavit offers two purported "connections" between Ms. Jackson and the Glenarden Residence. First, SA Kimrey vaguely states that in 2017 and 2018, "[m]ultiple" checks were written to Ms. Jackson from "HMA's TD Bank account" (which is not identified) and contemporaneously deposited into Ms. Jackson's Bank of America account, which "lists [Ms.] Jackson's home address" at the Glenarden Residence. Notably, there is no reference to when SA Kimrey or other law enforcement first – or last – saw that the address was associated with the bank account, even though the last deposit was in 2018.

Second, the Affidavit states that on April 5, 2017, an email address purportedly associated with Ms. Jackson (but not HMA) – "my2als@gmail.com" – received a blank email from Peebles with "an unsigned draft version of the HMA Consulting Agreement with Infused" attached. SA Kimrey asserts that, "[a]ccording to GoDaddy, the my2als@gmail.com address' most current bill was paid by [Ms.] Jackson's Mastercard … with the billing address listed as TARGET PREMISIS [sic] #2." There is nothing in the Affidavit about when that "most current bill" was, nor is there

any other reference or fact related to this email described in the Affidavit. There is nothing in the Affidavit connecting the Glenarden Residence to any fact after 2018.

**ARGUMENT**

In reviewing a challenge to a search warrant, the Court is tasked with "ensur[ing] that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). This is because the Fourth Amendment "bars search warrants issued on less than probable cause[.]" *United States v. McCall*, 740 F.2d 1331, 1335 (4th Cir. 1984). In the context of a warrant, probable cause demands that, under the totality of the circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 230; *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019); *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993).

"[T]ime is a crucial element of probable cause." *McCall*, 740 F.2d at 1335-36. Indeed, the Fourth Amendment requires that an application for a search warrant contain allegations of "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Id.* at 1335–36 (quoting *Sgro v. United States,* 287 U.S. 206, 210-11 (1932)). Whether the facts and allegations offered in support of a warrant meet this test must be determined by the circumstances of each case. *Id.* (same). Where it appears that facts offered in support of probable cause were not current at the time the warrant was issued, the probable cause is said to be "stale." *Id.* "[E]vidence seized pursuant to 'stale' probable cause is not admissible in a criminal trial to establish the defendant's guilt." *Id.* at 1336.

As the Fourth Circuit explained in *United States v. Lyles*, "when it comes to the Fourth Amendment, the home is first among equals." 910 F.3d 787, 793 (4th Cir. 2018) (quoting *Florida*

8

*v. Jardines*, 569 U.S. 1, 6 (2013)). "And 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed ....'" *Id.* (quoting United *States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 313 (1972)).

I.      **The Affidavit Failed to Demonstrate Probable Cause to Search the Glenarden Residence.**

The genuine focus of the Affidavit and investigation is clear: HMA's submission of invoices for work that HMA allegedly did not perform under the M111 and 136A Contracts. However, the Affidavit lacked sufficient factual allegations connecting Ms. Jackson to *any* alleged wrongdoing under either the M111 or 136A Contracts (or any other contracts), or Ms. Jackson to the Glenarden residence. Accordingly, the Affidavit failed to establish probable cause to believe that evidence of the Target Offenses – all of which relate to HMA – would be found at the Glenarden Residence.

The Affidavit does not contain a single fact supporting that Ms. Jackson submitted or approved invoices on behalf of HMA or that she sent an email related to HMA's billing on the M111 and 136A Contracts. At best, the Affidavit broadly discusses Ms. Jackson's "affiliation" with HMA generally. Specifically, the Affidavit states only that: (1) an unidentified complainant "believed" that Ms. Jackson participated in the creation of HMA; (2) Masood's assistant at Infused "believed" the "H" in HMA stood for Ms. Jackson's first name (Harriett); (3) Ms. Jackson apparently is identified on a bank account with Masood where Masood listed an HMA email address as his point of contact in 2017 (notably, there are no allegations of this bank account being used in furtherance of HMA activities); (4) an email address of "harriet@hmasolutionsllc.com" exists (although there are no allegations that this email address was used); and (5) at varying times in 2017 and 2018, Ms. Jackson was a payee of HMA. The only two "facts" that purport to connect Ms. Jackson to HMA's alleged fraudulent invoicing are (1) SA Kimrey's belief that Peebles and

9

Ms. Jackson were paying WR's internal coding supervisor $1,500 per month during the relevant period (neither the purported basis of which nor the means is stated in the Affidavit) and (2) that on April 5, 2017, Peebles emailed Ms. Jackson, at a non-HMA-affiliated email address ("my2als@gmail.com"), a blank email with a draft consulting agreement between HMA and Infused attached.

On the other hand, there are several allegations in the Affidavit that cut *against* finding probable cause to believe Ms. Jackson was involved in HMA's alleged fraudulent activities. First, unlike Masood and Peebles, Ms. Jackson is neither a member of HMA nor did law enforcement locate a W-2 for her in HMA's records. Second, importantly, Ms. Jackson is not alleged to have sent emails on HMA's behalf, signed or provided agreements on HMA's behalf, or submitted or approved invoices on HMA's behalf (again, unlike Masood and Peebles).

Since the Affidavit contained no nexus between Ms. Jackson and the Target Offenses, there was not a substantial basis for finding that any evidence of the Target Offenses would be at the Glenarden Residence. When analyzing the nature of the items seized and place to be searched, courts focus on allegations regarding residency (as opposed to mere ownership) and connections between the criminal activity alleged and the residence. "[R]esidential searches have been upheld only where some information links the criminal activity to the defendant's residence." *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993); *see also United States v. Johnson*, 865 F.Supp.2d 702, 704-05 (D. Md. 2012) (holding that it was reasonable to infer that a computer used in March 2020 for child pornography was located in the defendant's residence in May 2021 when the affidavit linked the IP address used to access the images in March 2020 to the address searched and as of May 4, 2011, the affidavit established that the defendant "owned and resided at the searched location"); *United States v. Richardson*. *See* 607 F.3d 357 (4th Cir. 2010) (affidavit

established sufficient nexus where it demonstrated that the defendant currently "resided" at the target location and "linked [the defendant's] email accounts, which he used to distribute child pornography, to his previous and current (at the time of the warrant) addresses"); *United States v. Lewis*, No. 17-4604, 733 F. App'x 83, 85 (4th Cir. May 4, 2018) (rejecting the defendant's arguments with respect to nexus and staleness where "the affidavit linked the criminal activity alleged—the establishment of multiple bank and credit union accounts and the transferring and movement of monies into and through those accounts . . . —to Lewis' residence through the use of Internet Protocol addresses issued to and a telephone number associated with that residence"). As part of this inquiry, courts will also consider "the nature of the item and the normal inferences of where one would likely keep such evidence." *See United States v. Indivior Inc.*, 448 F. Supp. 3d 587, 602 (W.D. Va. 2020) ("It was eminently reasonable to suspect that a business entity suspected of committing fraud would store evidence at its headquarters."); *see also Johnson*, 865 F.Supp.2d at 708 (also considering that "common sense dictates that a computer containing illicit images would be stored in a private home").

Setting aside the absence of any allegations regarding Ms. Jackson's criminal activity, nowhere does the Affidavit even state that Ms. Jackson resided at the Glenarden residence. Rather, all the Affidavit (in Attachment A-2) provides is that Ms. Jackson owned the residence (without any explanation of how that fact was formed or when she owned it) and the residence was associated with a credit card Ms. Jackson used almost five years earlier and a bank account that received deposits four and five years earlier. The Affidavit also lacked sufficient factual allegations connecting Ms. Jackson to HMA's alleged fraudulent billing scheme for the reasons discussed above. Instead, the factual allegations regarding Ms. Jackson's conduct (*i.e.*, her role under the 136A contract) were actions taken on behalf of CASE. There are no allegations that any of CASE's

billings were fraudulent or that, by performing work on behalf of CASE, Ms. Jackson participated in HMA's fraudulent billing. The Affidavit also contained no allegations regarding whether CASE had a physical location (unlike the investigation into HMA's physical location) or where Ms. Jackson performed any of her CASE-related responsibilities.

Accordingly, there was not a substantial basis for believing: Ms. Jackson was involved in the Target Offenses; there was a direct link between any of Ms. Jackson's conduct and the Glenarden residence; or a rational inference supported that devices containing HMA's business records would be stored in the Glenarden residence. *See, e.g.*, *Lalor*, 996 F.2d at 1582 (holding that the affidavit did not "describe circumstances that indicate such evidence of [drug activity] was likely to be stored at [the defendant's] residence"). Therefore, the warrant must be suppressed unless an exception to the exclusionary rule applies.

## II.     The Affidavit Rested on Stale Information.

Under the facts described above, there never was probable cause to believe evidence of the Target Offenses would be at the Glenarden residence. Even if this Court disagrees, any probable cause was stale after three, four, and five years lapsed between the events described in the Affidavit and March 31, 2022, and therefore was insufficient to support a search of the Glenarden Residence.

This Court has explained that a staleness challenge rests on the "fundamental inquiry [of] whether the alleged facts are so dated that, at the time of the search, it is doubtful that evidence of criminal activity can still be found at the premise searched." *United States v. Johnson*, 865 F. Supp. 2d 702, 705 (D. Md. 2012) (citing *McCall*, 740 F.2d at 1336). "The vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *United States v. Farmer*, 370 F.3d 435, 439 (4th Cir. 2004) (citation omitted). Rather, when determining whether probable cause is "stale," courts look

to "all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *McCall*, 740 F.3d at 1336. An important factor is whether the alleged unlawful activity is part of an "elaborate" or "ongoing" course of conduct. *Farmer*, 370 F.3d at 439 (citation omitted).

First, the fraud is alleged to have occurred under specific contracts – the M111 and 136A contracts. The alleged fraudulent activity was therefore not ongoing in nature; the discrete contracts, and HMA's activities thereunder, had end dates. The lapse of time between HMA's alleged fraudulent activities under these contracts and the date of the Affidavit is then *significant*. Indeed, the Affidavit alleges that HMA (specifically, Masood) submitted fraudulent billing invoices under (1) the M111 Contract between February 2017 and January 2019, and (2) the 136A Contract between (presumably) September and October 2017.[6] Accordingly, at a minimum, more than ***three years*** passed between the ***last*** alleged activity in furtherance of the Target Offenses— the submission of an invoice under M111 in January 2019—and the issuance of the Warrant. There are no allegations whatsoever in the more than three years since the last alleged activity of ongoing fraudulent behavior. And since Ms. Jackson is not alleged to have done *anything* in furtherance of the M111 contract, even her alleged lawful conduct occurred more than four and a half years before the issuance of the Warrant.

Second, there is an even more significant gap in time between the events alleged to connect Ms. Jackson to the Glenarden Residence and the issuance of the Warrant. As noted above, SA Kimrey offers only two "connections" between Ms. Jackson and the Glenarden Residence: (1) that at some time in 2018, Ms. Jackson deposited checks from HMA into a Bank of America account

---

[6] As noted *supra*, the Affidavit does not identify when HMA allegedly submitted fraudulent invoices under the 136A Contract, but the only two events SA Kimrey describes in relation to the 136A Contract occurred in September and October 2017. Affidavit, ¶¶ 16-17.

that, at some unidentified time (but presumably in 2018), listed the Glenarden Residence as Ms. Jackson's home; and (2) that the "most current bill" for an email account that existed in April 2017 was paid by a credit card that listed the Glenarden Residence as the billing address. Curiously, however, the Affidavit does not specify (1) when law enforcement first – or last – identified the Glenarden Residence as being associated with the Bank of America account; (2) whether Ms. Jackson still maintained the Bank of America account in 2022; (3) when the "most current bill" for the email account was paid; (4) whether Ms. Jackson still owned the credit card that was used to pay it; (5) whether the credit card was still associated with the Glenarden Residence; or (6) whether the email account had been used at any time since April 5, 2017. It would be unreasonable for this Court to infer that any of these facts occurred in 2022 (or at any time reasonably recent thereto); had that been the case, SA Kimrey surely would have included them in the Affidavit.

At best, the Affidavit simply demonstrates that the Glenarden Residence was associated with (1) a bank account that received deposits four and five years before March 31, 2022 and (2) a credit card in Ms. Jackson's name nearly five years ago, which was insufficient to establish probable cause that evidence of the Target Offenses would be at the Glenarden Residence. *See, e.g.*, *United States v. Gary*, 420 F. Supp. 2d 470, 476 (E.D. Va. 2006), *aff'd,* 528 F.3d 324 (4th Cir. 2008) (concluding that the affidavit, considered on its face, rested on stale probable cause of drug trafficking a year after a single trashcan search was done, explaining that "[w]hile drug trafficking is an activity that certainly may be engaged in for more than a year," there were no allegations "assert[ing] ongoing drug trafficking activity for more than a year" *or* that the same occupants lived at the searched home at the time of the trashcan search and the execution of the warrant).

14

Ms. Jackson is not alleged to have performed any acts in furtherance of HMA's alleged fraudulent billing. Yet, three years after another individual is alleged to have done so, and four and five years after scant connections between Ms. Jackson and the Glenarden Residence, law enforcement searched her home. There can be no doubt that the information contained in the Affidavit — to the extent it ever furnished probable cause — was too old to furnish "'present' probable cause." *McCall*, 740 F.2d at 1336 (collecting cases). Therefore, this Court must enforce Ms. Jackson's Fourth Amendment rights, which protects her home as the "first among equals," *Jardines*, 133 S.Ct. at 1414, and suppress the evidence seized on April 6, 2022.

### III.     The Scope of the Items to Be Seized Was Overbroad.

The Warrant, which authorized the search of records and electronic devices not only relating to HMA but also several entities, was also overbroad. A warrant must be "no broader than the probable cause on which it is based." *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (quoting *United States v. Zimmerman,* 277 F.3d 426, 432 (3rd Cir. 2002)). "This requirement ensures that the search is confined in scope to particularly described evidence relating to a specific crime for which there is probable cause." *United States v. Oloyede*, 982 F.2d 133, 138 (4th Cir. 1992) (citation omitted). In other words, this requirement prohibits "general, exploratory rummaging." *Id.* (citation omitted); *see also United States v. Indivior Inc.*, 448 F. Supp. 3d 587, 603 (W.D. Va. 2020) ("The Fourth Amendment's requirement for particularity 'ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987))).

Accordingly, warrants may only authorize the search and seizure of items relating to the alleged criminal conduct. *See Indivior Inc.*, 448 F. Supp. 3d at 603 ("The particularity requirement

15

limits and authorizes the search for and seizure of evidence relating to the alleged criminal conduct — in this case, conspiracy, health care fraud, misbranded drugs, and false claims."); *see also United States v. Shah*, No. 5:13-CR-328-FL, 2015 WL 72118, at *12 (E.D.N.C. Jan. 6, 2015) ("Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d 847, 856 (9th Cir. 1991))).

In *United States v. Lyles*, the Fourth Circuit upheld this Court's ruling that a warrant was overbroad when it justified the search of the defendant's home based on potential violations of criminal and civil provisions against the possession of marijuana, but, "without any explanation or rationale," included authority to search "a wide variety of items beyond marijuana," including electronic equipment, books, records, and more. No. CR TDC-17-0039, 2017 WL 5633093, at *5 (D. Md. Nov. 20, 2017), *aff'd,* 910 F.3d 787 (4th Cir. 2018). This Court's review of the items seized clearly "reveal[ed] that the warrant contemplated a search for evidence of drug trafficking, a crime for which there plainly was no probable cause." *Id*. The Fourth Circuit agreed, explaining that while the warrant was "chiefly based . . . on finding three marijuana stems in the trash," the warrant "empowered the police to seize a host of things seemingly unconnected to marijuana possession." 910 F.3d at 795.

In this case, to the extent the Affidavit established any probable cause for the Target Offenses, which it did not, that probable cause exclusively related to HMA's submission of invoices for work that HMA allegedly did not perform under the M111 and 136A Contracts. However, Attachment B to the Affidavit, describing the property to be seized, was not limited solely to HMA activity, but rather sought:

1.      All records relating to violations of [the Target Offenses], including:

a.   All records, evidence, fruits of, and property whether in physical format or electronic, used in, the offense of violations of [the Target Offenses] involving: Michelle PEEBLES, Harriet JACKSON, Akbar MASOOD, Filza Akbar, and any other affiliated individuals (hereinafter referred collectively as the INDIVIDUALS); and pertaining to any of the following companies: *Infused Solutions, Case Health Care Solutions, Salient Strategic Solutions,* and HMA Solutions, *R.T. McCalpin and Associates, and any other affiliated companies* (hereinafter referred collectively as the COMPANIES) and occurring after December 17, 2013 to present date[.]

Affidavit, Attachment B (emphasis added). Attachment B further identified the various devices that Agent Kimrey believed would potentially hold this information, including "communication devices" and "[c]omputer(s), computer software, software, related documentation, passwords, data security devices . . ., videotapes and or video recording devices." *Id.*

By incorporating Attachment B, the Warrant clearly authorized "wide-ranging exploratory searches" despite the limited, if any, probable cause established by the Affidavit. The Affidavit did not contain any facts establishing probable cause to believe Infused, CASE, Salient Strategic Solutions, or R.T. McCalpin and Associates committed the Target Offenses or would have relevant records to the Target Offenses. Nonetheless, it authorized the search of voluminous physical and electronic records possessed by Ms. Jackson, Peebles, Masood and affiliates relating to these companies. We know based on the Affidavit that these records would include numerous records documenting entirely lawful activities (for example, CASE and RT McCalpin's work under the 136A contract).

The Warrant was also overly broad as it authorized the search of Ms. Jackson's electronic records contained in "communication devices" and computers. Indeed, the government seized three laptops, a computer, three iPhones, and two iPads from the Glenarden Residence. Exh. 2. As the Supreme Court has recognized, "a cell phone search would typically expose to the government

far *more* than the most exhaustive search of a house," as it "contains a broad array of private information never found in a home in any form—unless the phone is." *Riley v. California*, 573 U.S. 373, 396-97 (2014) (emphasis in original); *see also United States v. Burton*, No. 17-4524, 756 F. App'x 295, 302 (4th Cir. Dec. 19, 2018) (noting that "robust privacy protections" apply to cell phone users).

The Affidavit contained no allegations tying Ms. Jackson's use of electronic devices to the Target Offenses. As has been stressed throughout this memorandum, Ms. Jackson is not alleged to have performed *any* acts in furtherance of HMA's alleged fraudulent billing, via electronic devices or not. The Affidavit in fact only alleged that she received *one email* relating to HMA, at a non-HMA affiliated email address, and *in 2017*. Rather, the allegations regarding her use of electronic devices, which all pertained to CASE, were allegations of lawful activity (and even then, activity that ended in 2017 or 2018). Agent Kimrey's generalized allegations that "[i]ndividuals who engage in fraudulent behavior and other criminal activity commonly use computers and mobile devices to access websites used for illegal activity," Affidavit ¶ 5, fare no better, where there are no allegations that Ms. Jackson engaged in fraudulent behavior and any probable cause in support of the warrant was stale. *See United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017) (reversing denial of motion to suppress cell phone evidence where the homicide at issue occurred a year prior, not only did the affidavit "convey[] no reason to think that Griffith, in particular, owned a cell phone," but there was also no reason to believe "that the device would be located in the home and would contain incriminating evidence about his suspected offense," and the passage of time belied the affiant's general allegations that gang/crew members used cell phones to communicate).

Therefore, the warrant was overly broad and thus invalid. To hold otherwise would endorse the idea that because nearly everyone utilizes cell phones or computers, a person's suspected

involvement in a crime justifies searching their home for any and all electronic devices, regardless of whether there is any indication they own such devices, there is any indication that the devices are being used for the crime, or three, four, or five years have passed since any conduct identified by the government. *See Riley*, 573 U.S. at 408 (noting the "very sensitive privacy interests" affected by the search of modern cell phones, which "are of great value for both lawful and unlawful purposes") (Alito, J., concurring in part).

## IV.    The "Good Faith" Exception to the Exclusionary Rule Does Not Apply.

In *United States v. Leon*, the Supreme Court noted an exception to the exclusionary rule based on an officer's good faith. 468 U.S. 897 (1984). Under the so-called "good faith exception," a court will suppress evidence obtained pursuant to a subsequently invalidated warrant if "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002)). While the issuance of a warrant typically suffices to establish that the officer acted in good faith, *Leon* identified four circumstances in which an officer's reliance is not "objectively reasonable":

> (1) when the issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) when "the issuing magistrate wholly abandoned his judicial role" …; (3) when "an affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) when "a warrant [is] so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Leon,* 468 U.S. at 923 (internal citations omitted). Accordingly, if any one (or more) of these situations applies, the evidence must be suppressed. *Id.*

Here, the Affidavit was "so lacking in indicia of probable cause" as to Ms. Jackson and the Glenarden Residence that law enforcement's reliance on it was unreasonable. First, the Affidavit contains no evidence that Ms. Jackson was involved in HMA's billing. Second, the affidavit only contained weak, and stale, connections between Ms. Jackson and the Glenarden Residence. Third, the affidavit contains no mention of law enforcement's effort to confirm that Ms. Jackson actually lived at the Glenarden residence, despite her residing there—permanently or while working for HMA—being a necessary piece to the affidavit's theory to search the Glenarden residence in the first place. In addition, the affidavit fails to provide any time period for significant events—the submission of invoices under the 136A contract, how long Ms. Jackson had owned the Glenarden residence, and when her bank account and credit card were linked to the Glenarden residence.

The inclusion of extraneous facts and statements only buttresses the lack of good faith in this case. For example, Agent Kimrey references the September 30, 2019, contract CASE was awarded by the NCR. There could have been no other purpose to include a reference to the September 30, 2019, contract other than to mislead the reviewing judge to perceive a closer temporal connection between alleged misconduct and the date the warrant was issued. Agent Kimrey also concludes without any actual support that "[i]nformation obtained during the course of the investigation suggests that MASOOD, PEEBLES, and JACKSON committed the TARGET OFFENSES through other government contracts supported by CASE, using another method of disguising their participation." Again, this statement was included for no other reason than to distract from the fact that the entire investigation was directed towards *HMA's* billing, which did not involve Ms. Jackson.

Moreover, the affidavit is riddled with typos, errors and overall signs of sloppiness. The affidavit, purporting to conclude that CASE was involved in the Target Offenses, never says when

CASE was created. The affidavit erroneously identifies "12110 Sunset Hills Road, Suite 600, Reston, VA 20190," as "TARGET PREMESIS [*sic*] 2." The affidavit states that a TD Bank account was associated with Target Premises 1, when no such bank account is mentioned. There are no paragraphs 33 through 35 in the affidavit. Attachments A-1 and A-2 state that the warrants reference biometric methods described in paragraph 44, when they are described in paragraph 43. And, as noted several times in this motion, the affidavit fails to provide any time period for significant events. *See United States v. Cooper*, No. 2:20-cr-0019, 2021 WL 411512, at \*4-5 (S.D.W.V. Feb. 5, 2021) (considering several substantial errors in the affidavit, characterizing them as "sloppiness," "suggestive of the absence of a good faith effort to gather and verify information prior to seeking a warrant and searching a house").

Finally, the overbreadth of the Warrant leans in favor of finding that the good faith exception does not apply. In *Lyles*, this Court held "the lack of probable cause for the search and the gross overbreadth of the warrant, taken together, put this search beyond the reach of the good faith exception." 2017 WL 5633093, at \*7 (citing *United States v. Griffiths*, 867 F.3d 1265, 1278 (D.C. Cir. 2017)). As explained above, here Agent Kimrey sought to search entirely lawful records relating to companies that were not involved in HMA's billing and electronic devices despite no factual support for their use.

For all of these reasons, *Leon* does not apply and the evidence recovered from the Glenarden residence must be suppressed.

## **CONCLUSION**

For all these reasons, this Motion to Suppress should be granted and government should be barred from admitting at trial any and all direct and derivative evidence resulting from the search of ▮ Sir Michael Place, Glenarden, Maryland 20706 on April 6, 2022.

Dated: December 6, 2023

Respectfully submitted,

/s/_____
Ty Kelly, Federal Bar #27166
tykelly@bakerdonelson.com
Annie M. Kenville, Federal Bar #20489
akenville@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
100 Light Street, 19th Floor
Baltimore, Maryland 21202
410-862-1339 - Telephone
443-547-0669 - Facsimile

*Attorneys for Defendant Harriett Jackson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of December, 2023, a copy of the foregoing Motion to Suppress was served on all counsel of record via ECF.

/s/_____
Ty Kelly, Federal Bar #27166